IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUETTA HAWKINS, et al., | ) | CASE NO. 5:11CV2753 |
| | ) | |
| Plaintiffs, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| SUMMIT COUNTY, OHIO, et al., | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendants. | ) | |

This matter is before the undersigned Magistrate Judge on Plaintiffs' Motion for Preliminary Injunction. Doc. 2.[1] Defendants filed their Opposition to the Motion on December 29, 2011 (Doc. 20) and an evidentiary hearing was held on December 30, 2011. After considering the arguments and evidence presented by the parties, the undersigned recommends, for the reasons stated below, that the Court DENY Plaintiffs' Motion for Preliminary Injunction.

## I. Findings of Fact

**A.   Background**

Plaintiffs are 21 females[2] who are employed by Defendant Summit County (the "County") as Deputy Sheriffs and are assigned to the Summit County Jail ("SCJ"). Each Plaintiff holds or has held one of a number of assignments at the SCJ, including: general intake, general security, female intake, and female security. Complaint, ¶ 8.

---

[1] This case was referred to the undersigned for general pretrial supervision, including the preparation of a report and recommendation on dispositive motions and motions for injunctive relief, pursuant to an Order dated December 27, 2011.  Doc. 9.

[2] The Plaintiffs in this action are Jacquetta Hawkins, Bethanne Scruggs, Cathy Phillips, Angela Berg, Tracy Braziel, Elaine George-Pickett, Diedre Heatwall, Melissa House, Heather Stewart, Cynthia Young, Meredith Wade, Peggy Starr, Lyn Watters, Shawntell Kennedy, Heather McPherson-Danner, Angela Molea, Patricia Bennett, Cynthia Wood, Angela Dent, Debra McMasters, and Stacy Clark (collectively "Plaintiffs").

Defendant Summit County Sheriff's Office ("Sheriff's Office"), under authority of the County, operates the SCJ.[3] Doc. 2, Exhibit 5, p.1. Defendant Drew Alexander is the Sheriff for Summit County. Doc. 1, ¶ 12. Defendant Gary James is the Chief Deputy of the Sheriff's Office and commander of the SCJ. Tr. Vol. I, p. 76.[4] In this capacity, he is responsible for the day-to-day operations at the SCJ. Tr. Vol. I, pp. 76-78. The SCJ is a large, full-service jail, which houses both male and female inmates. Doc. 2, Exhibit 5, p.1. The SCJ houses incarcerated individuals who are arrested and charged with misdemeanors and felonies, including murder, rape, and assault. *Id.* Upon adjudication, inmates convicted of felonies are transferred to state facilities while inmates convicted of misdemeanors serve a jail sentence at the SCJ. *Id.*

On August 30, 2010, Defendants filed an application with the Ohio Civil Rights Commission ("OCRC") for a bona fide occupational qualification ("BFOQ") for certain job c1assifications at the SCJ (the "BFOQ Application").[5] In support, Defendants stated that, from 2006 to 2010, the average daily population at the SCJ was 600 inmates, 81.59% male and 18.41% female. Doc. 20, Exhibit B, p. 2. Defendants explained the job classifications that were the subject of the BFOQ Application as follows:

- Intake is the job classification where all inmates are initially booked into the Jail and are required to be strip searched and showered.

\* \* \*

- Female Security Pod is the job classification for the section of the Jail ("pod") that incarcerates all female inmates.

---

[3] The Defendants in this action are referred to collectively as "Defendants".

[4] Because of the expedited nature of the instant matter, a certificated copy of the transcript of the Preliminary Injunction Hearing is not available. Thus, all citations to the transcript in this Report & Recommendation are to the uncertified draft of the transcript, which was separated into two volumes.

[5] Defendants filed the BFOQ application under provisions of Ohio law, O.R.C. § 4112.02 and O.A.C. § 4112-3-15. Under federal law, when gender discrimination is alleged under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), a defendant may assert as a defense the existence of a BFOQ. *Everson v. Michigan Department of Corrections*, 391 F.3d 737, 747-48 (6th Cir. 2004). The Court notes, without deciding how the distinction ultimately might apply in this case, that a BFOQ certification issued by the Ohio Civil Rights Commission may not be dispositive of a federal Title VII claim.

- Float is the job classification that allows a deputy to be assigned to two different bid classification jobs (intake or a security pod) as needed without violating the collective bargaining agreement.

- Job classifications are currently staffed based on seniority in accordance with the Fraternal Order of Police collective bargaining agreement.  All deputies are subject to the terms and conditions of the collective bargaining agreement.

Doc. 20, Exhibit B, p. 2.  Defendants also explained the scope of the BFOQ with regard to each job classification and the reasons why they believed a BFOQ was necessary:

- A Bona Fide Occupational Qualification is necessary for the job classifications for Intake, Female Security Pod and Float because the current seniority system does not comply with state and federal laws that are gender specific.  In order to operate the Jail, the deputies [sic] gender is a requirement for complying with the laws for strip searches, showers and the inmates [sic] constitutional rights to privacy.

- Currently, under the seniority system, the Intake day shift is staffed by almost all female deputies and the midnight shift is staffed by almost all male deputies.  The day shift of nearly all women by law can not strip search and shower 82% of the inmates arriving during the day shift because they are male.  With the midnight shift of nearly all men, often a female deputy is not available to conduct the strip searches and showers for female inmates arriving during that shift.  A bona fide occupational qualification is necessary, based on gender, to ensure that the Intake job classification is adequately staffed by males and females during all shifts to comply with the gender specific laws.

- The Float job classification requires a bona fide occupational qualification to ensure that female deputies are available for all shifts.  If no female deputy is available for the intake or security shift, another female deputy can not be moved from their assigned bid jobs as a replacement because it violates the terms of the collective bargaining agreement.  A group grievance and two individual grievances were filed because of moving female deputies from their bid assignments . . . A bona fide occupational qualification for the Float position will ensure that female deputies are available as needed during all shifts and the collective bargaining agreement will not be violated.

- The Female Security Pod job classification requires a bona fide occupational qualification to ensure that only female deputies patrol the all female section of the jail.  Inmates have a constitutional right to privacy for such matters as using the toilet, showering and dressing.  The Jail has a responsibility to provide for security including the prevention of sexual abuse.  The policies of

3

> prison administrators are entitled to a degree of deference because of the responsibilities of operating a jail facility.
>
> • The job classification for Male Security Pod is not part of the application and a bona fide occupational qualification is not being requested for this job classification.  Both male and female deputies are assigned this job classification based on seniority under the collective bargaining agreement and it is not based on gender.  The job classifications consist of 32 deputies for Day Shift; 30 deputies for Afternoon Shift; and 27 deputies for Midnight Shift.

Doc. 20, Exhibit B, p. 3.

On January 26, 2011, the OCRC granted in part the application for a BFOQ.  Doc. 20, Exhibit A.  The OCRC's BFOQ Certification letter ("the BFOQ") contained findings based on the BFOQ Application, including a finding that, "in order to comply with the requirements of Ohio law, a minimum number of positions on each shift and duty assignment must be set aside for members of the appropriate sex."  Doc. 2, Exhibit 5, p. 1.  The BFOQ also set forth "Limitations," including the following:

> [C]ertification of sex as a bona fide occupational qualification for the position of Deputy Sheriff is granted only insofar as it is necessary for the Summit County Sheriff's Office to meet the requirements of O.A.C. Section 5120: 1-8-17(D)(1).[6]  This certification is strictly limited to the classification of Deputy Sheriff and the assignments necessary to meet the operation needs of the jail facility.

Doc. 2, Exhibit 5, p. 1.  The BFOQ also stated "Conditions," including, "This certification is strictly limited to the number of positions necessary to meet the operational needs of the jail facility."  Doc. 2, Exhibit 5, p. 2.

---

[6] O.A.C. Section 5120: 1-8-17(D)(1) provides:

> **(D)** There shall be a written, implemented staffing plan that includes jail personnel assignments, days of the week and hours of the day that assignments are covered and any deviations from the plan with respect to weekends, holidays or other atypical situations.
>
>> **(1)** The plan shall include all posts and functions, a calculated shift relief factor, sufficient numbers of male and female jail staff on-duty and available to perform sensitive functions and procedures as necessary by prisoner gender, and total number of employees required to fill identified posts and functions.

4

**B.     Implementation of the BFOQ**

All deputies employed by the Sheriff's Office and affected by the BFOQ are members of the Fraternal Order of Police ("FOP").  Doc. 20, Exhibit D.  During the negotiation of the current Collective Bargaining Agreement ("CBA"), concerns were raised by union members regarding the then-pending BFOQ application.  Tr. Vol. I, pp. 20-21, 90-92.  As part of the contract negotiations, on February 14, 2011, the FOP and Sheriff's Department agreed to a Memorandum of Understanding ("MOU") regarding the BFOQ, which authorized mediator Robert Stein to resolve issues surrounding shift bidding affected by the implementation of the BFOQ.  Doc. 20, Exhibit 4, p. 45.  On November 30, 2011, after an arbitration hearing, Mr. Stein issued an Order setting forth the 2012 shift bid process for the SCJ, which included positions of Female Security, Male Security, Female Intake, Male Intake, and Female Float.  Doc. 20, Exhibit C.

Meanwhile, on November 10, 2011, the Sheriff's Office issued a 2012 Shift/Day off Bids memorandum, which outlined the bidding procedure for 2012.  Doc. 3, Exhibit 1.  The memorandum specifically referenced the BFOQ and provided that there will be vacancies in both male and female intake assignments. Doc. 3, Exhibit 1.  It also set forth the relevant positions at the SCJ for bidding:  intake male, intake female, security male, security female, and security/intake female float.  Doc. 3, Exhibit 1.

On November 14, 2011, the Summit County Sheriff's Office issued an addendum to the 2012 Shift/Day off Bids memorandum to clarify that female deputies "may **ONLY** bid for female assignments (Female Intake, Female Float, and Female Security."  Doc. 3, Exhibit 2 (emphasis in original).  The addendum also provided that there would be "eleven (11) female assignments on day shift, eleven (11) female assignments on afternoon shift, and ten (10) female assignments on the midnight shift."  Doc. 3, Exhibit 2.

On December 5, the Summit County Sheriff's Office issued another clarification of the 2012 Shift/Day off Bids memorandum. Doc. 3, Exhibit 3. The document cautioned that female deputies were not to bid on any of the male positions and that there would no longer be positions available to female deputies in "General Security." Doc. 3, Exhibit 3. It further stated that "[a]ny female whose bid sheet shows their first choices in male positions will be INVALID, and that deputy will be placed on a shift and given days off that are vacant." Doc. 3, Exhibit 3.

On December 13, 2011, Defendants posted the Shift Bid Results for 2012 with a schedule showing the results of the bidding process. Doc. 3, Exhibit 4. This document also provided that the implementation date for the new shifts would be January 2, 2012. Doc. 3, Exhibit 4. By letter dated December 16, 2011, Defendants notified the OCRC that they were invoking the BFOQ. Defendants' Exhibit H. Defendants also provided the OCRC with a list of the female deputies who were affected by the BFOQ. *Id.*

## II. Law & Analysis

The purpose of a preliminary injunction is to maintain the status quo or relative position of the parties in order to preserve the ability of the court to make a meaningful decision after trial on the merits. *U.S. v. Edward Rose & Sons,* 384 F.3d 258, 261 (6th Cir. 2004); *Corbin v. Texaco, Inc.,* 690 F.2d 104, 105 (6th Cir. 1982). In determining whether to grant a preliminary injunction, a court must consider four factors: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). "These four considerations are 'factors to be balanced, not prerequisites that must be met.'" *Certified Restoration Dry Cleaning Network,*

*L.L.C. v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Jones v. City of Monroe,* 341 F.3d 474, 476 (6th Cir. 2003)). "Moreover, a district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." *City of Monroe*, 341 F.3d at 476. The movant bears the burden of establishing that "the circumstances clearly demand" this extraordinary remedy. *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

**A. Likelihood of Success on the Merits**

The first factor to consider on a motion for preliminary injunction is "whether the plaintiff has demonstrated a strong likelihood of success on the merits." *Certified Restoration Dry Cleaning Network,* 511 F.3d at 543. While a party is not required to prove his entire case at a preliminary injunction hearing, to establish success on the merits, a plaintiff must show "'more than a mere possibility of success.'" *Id.* (citing *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) and quoting *Six Clinics Holding Corp. II v. Cafcomp Sys., Inc.,* 119 F.3d 393, 402 (6th Cir. 1997)).

Plaintiffs' Amended Complaint asserts three counts against Defendants: (1) Count I alleges a violation of 42 U.S.C. § 1983; (2) Count II alleges a sex discrimination claim in violation of 42 U.S.C. § 2000e *et seq.,* and Ohio Revised Code §§ 4112.02 and 4112.99; and (3) Count III alleges a violation of the Supremacy Clause of the U.S. Constitution. Doc. 12. Upon review of the evidence presented at the hearing, Plaintiffs have established more than a mere possibility of success on their claims.

1.  **Plaintiffs' Title VII Claims**

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[it] shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex[.]" 42 U.S.C. § 2000e-2(a)(1). Plaintiffs assert Title VII sex discrimination claims based upon a facially discriminatory employment policy. Doc. 12, p. 12. Defendants admit that the Sheriff's Office adopted a facially discriminatory plan for the 2012 job classifications and bidding process. In *Everson v. Mich. Dep't of Corr.,* 391 F.3d 737 (6th Cir. 2004), the Sixth Circuit made clear that, when open and explicit use of gender is employed, the case will turn on "whether such overt disparate treatment is for some reason justified under Title VII." *Id.* at 747; *see also Reed v. County of Casey,* 184 F.3d 597, 599 (6th Cir. 1999) [7] Title VII permits overt discrimination if the disparate treatment is based on a BFOQ. *Id.;* 42 U.S.C. § 2000e-2(e).

The BFOQ defense countenances gender-based discrimination "in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e) (2001). In *International Union v. Johnson Controls, Inc.,* 499 U.S. 187, 221-22, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), the U.S. Supreme Court interpreted the BFOQ exception to mean that discrimination is permissible only if those aspects of a job that allegedly require discrimination fall within the "essence of a particular business." *Id.* at 206. In other words, gender discrimination is valid "when the essence of the business operation would be undermined if the

---

[7] Inexplicably, Plaintiffs, in their Motion for Preliminary Injunction and supporting Memorandum, failed to cite *Everson* and only tangentially referenced *Reed* although those cases state the controlling law in the Sixth Circuit. Plaintiffs are cautioned that failure to cite controlling case law will not be tolerated. In all future matters, Plaintiffs shall cite to controlling Sixth Circuit cases even if they believe such cases are distinguishable on their facts. They may then explain why the cases are distinguishable. It is simply unacceptable to ignore such cases. *See Gonzalez-Servin v. Ford Motor Co.*, No. 11-1665, 2011 U.S. App. LEXIS 23670, 2011 WL 5924441 (7th Cir. Nov. 23, 2011).

business eliminated its discriminatory policy." *Dothard v. Rawlinson,* 433 U.S. 321, 332, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

The BFOQ defense is written narrowly and is to be read narrowly. *Everson,* 391 F.3d at 747-48 (citing *International Union,* 499 U.S. at 201). The burden is on an employer to establish a BFOQ defense. *Everson,* 391 F.3d at 747-48. The BFOQ defense applies to numerous employment decisions, including, *inter alia*, the transfer of an employee to another shift. *See, e.g., Moteles v. University of Pa.,* 730 F.2d 913, 920 (3d Cir. 1984) ("Operating under the BFOQ exception, an enterprise may legally exclude a person from a position either on the initial hiring or by transfer during the term of employment.").

In two cases, *Everson* and *Reed*, the Sixth Circuit has upheld prison officials' use of the BFOQ defense. In *Everson*, the Sixth Circuit reversed the district court's ruling in favor of prison employees who challenged the decision of the Michigan Department of Corrections to bar males from working in housing units at all-female prisons following female prisoners' allegations of sexual abuse by male guards. In its opinion reversing and remanding the case for further proceedings, the Sixth Circuit noted that the reasoned decisions of prison officials are entitled to deference and the goals of security, safety, privacy, and rehabilitation can justify gender-based assignments in female correctional facilities. *Everson*, 391 F.3d at 750. In *Reed*, the Sixth Circuit upheld, under the BFOQ defense, a county jail's transfer of a female employee from the day shift to the third shift because a female deputy was needed on the third shift when most female prisoners arrived at the jail. *Reed,* 184 F.3d at 599.

Plaintiffs argue that the implementation of the BFOQ by Defendants, through the 2012 job classifications and bidding process, is not narrowly tailored and unlawfully discriminates against female deputies. In response, Defendants argue the implementation is narrowly tailored


business eliminated its discriminatory policy." *Dothard v. Rawlinson,* 433 U.S. 321, 332, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

The BFOQ defense is written narrowly and is to be read narrowly. *Everson,* 391 F.3d at 747-48 (citing *International Union,* 499 U.S. at 201). The burden is on an employer to establish a BFOQ defense. *Everson,* 391 F.3d at 747-48. The BFOQ defense applies to numerous employment decisions, including, *inter alia*, the transfer of an employee to another shift. *See, e.g., Moteles v. University of Pa.,* 730 F.2d 913, 920 (3d Cir. 1984) ("Operating under the BFOQ exception, an enterprise may legally exclude a person from a position either on the initial hiring or by transfer during the term of employment.").

In two cases, *Everson* and *Reed*, the Sixth Circuit has upheld prison officials' use of the BFOQ defense. In *Everson*, the Sixth Circuit reversed the district court's ruling in favor of prison employees who challenged the decision of the Michigan Department of Corrections to bar males from working in housing units at all-female prisons following female prisoners' allegations of sexual abuse by male guards. In its opinion reversing and remanding the case for further proceedings, the Sixth Circuit noted that the reasoned decisions of prison officials are entitled to deference and the goals of security, safety, privacy, and rehabilitation can justify gender-based assignments in female correctional facilities. *Everson*, 391 F.3d at 750. In *Reed*, the Sixth Circuit upheld, under the BFOQ defense, a county jail's transfer of a female employee from the day shift to the third shift because a female deputy was needed on the third shift when most female prisoners arrived at the jail. *Reed,* 184 F.3d at 599.

Plaintiffs argue that the implementation of the BFOQ by Defendants, through the 2012 job classifications and bidding process, is not narrowly tailored and unlawfully discriminates against female deputies. In response, Defendants argue the implementation is narrowly tailored

and essential to the operation of the jail. Chief James testified that the changes to the job classifications and bidding process were implemented in order to ensure proper coverage by female deputies on all three shifts at the SCJ. Tr. Vol. I, pp. 83-85. He explained that, under the former bidding system, there was a shortage of female deputies on the midnight shift. As female deputies gained seniority, they were able to bid successfully on jobs on the day shift. Tr. Vol. I, pp. 83-86. In 2011, Chief James testified, 23 female deputies out of 36 were on the day shift and only 6 female deputies were on the midnight shift. Tr. Vol. I, p. 84. In November 2011, the shortage of female deputies on the midnight shift was exacerbated when one of the six female deputies suffered a tragic motorcycle accident and was off work for a lengthy period time and another female deputy took a personal leave of absence for six months, so that there were only 4 female deputies working the midnight shift. Tr. Vol. I, pp. 85-86. In order to have an adequate number of female deputies on the midnight shift, the SCJ has had to pay for female deputies from other shifts to work overtime, either voluntary or mandatory. Tr. Vol. I, pp. 86-87. Defendants argue that the sex-based discrimination is necessary in order to ensure that each shift is staffed with enough female deputies to comply with legal requirements for strip searches and showers, to address security concerns, and to protect the privacy interests of the inmates.

     Defendants have the burden of establishing that there are no reasonable alternatives to the job classifications and bidding process they implemented for 2012. *See Reed,* 184 F.3d at 599. The essential nature of the SCJ is to "lodge, keep, transport, feed, and care for prisoners." *Id.* at 599. Defendants correctly state that Ohio Revised Code § 2933.32 requires strip searches to be conducted by persons who are of the same sex as the person being searched. O.R.C. § 2933.32(B)(6). Defendants perform strip searches by taking an inmate to a separate shower area and performing the strip search at the same time the inmate is showered. Tr. Vol. I, pp. 59-60.

This is a valid factual basis for the BFOQ because, if no female deputies are working the midnight shift, the male deputies could not conduct strip searches of female inmates.

Defendants also argue that the BFOQ is necessary to address security concerns and to safeguard the privacy rights of inmates.  At this preliminary stage of the proceedings, no conclusions are made with regard to the validity of these arguments.  However, with regard to the issue of inmate privacy, i.e. concerns regarding use of the toilet, showering, and dressing, it has been held that a prison can usually preserve the privacy interests of its inmates without sacrificing the right of correctional officers to equal employment opportunities.  *See, e.g., Hardin v. Stynchcomb*, 691 F.2d 1364 (11th Cir. 1982); *Forts v. Ward*, 621 F.2d 1210 (2d Cir. 1980); *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8th Cir.), *cert. denied*, 446 U.S. 966 (1980); *Edwards v. Department of Corrections*, 615 F. Supp. 804 (M.D. Ala. 1985); *Bagley v. Watson*, 579 F. Supp. 1099 (D. Or. 1983); *Griffin v. Michigan Dep't of Corrections*, 654 F. Supp. 690 (E.D. Mich. 1982); *Harden v. Dayton Human Rehabilitation Center*, 520 F. Supp. 769 (S.D. Ohio 1981), *aff'd*, 779 F.2d 50 (6th Cir. 1985).  The Court also notes that Defendants' reliance on *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987) for the proposition that same-sex deputies must patrol the male and female pods in order to protect the privacy of inmates when showering (Doc. 20, p. 6) is misplaced.  *Kent* was a decision on a motion to dismiss an inmate's claim based on his religious beliefs as well as his right to privacy, in which the Sixth Circuit held that the complaint must be construed liberally in the plaintiff's favor and the motion to dismiss should not be granted unless it appeared beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief.  *Kent,* 821 F.2d. at 1127-28.

Although Defendants have asserted valid reasons for seeking the BFOQ, Plaintiffs have raised legitimate question as to whether Defendants went too far as to the number of positions

classified by sex. The issue is whether Defendants had reasonable alternatives to the changes to job classifications and the bid process that they implemented for 2012. *See Reed,* 184 F.3d at 599-600. Defendants have not met their burden on this issue at this stage of the litigation. Indeed, in their application for the BFOQ, Defendants stated that the Male Security Pod assignment would not be affected by the BFOQ, and that both males and females could still bid on this classification. Doc. 20, Exhibit B, p. 3. However, under the 2012 bid process implemented by Defendants, female deputies were not permitted to bid on male security positions. This is beyond the scope of the BFOQ.[8] Although Defendants have shown some justification for the new job classifications and bid process, they have failed to establish, at this point, that there were no reasonable alternatives available. Thus, Plaintiffs have established that there is more than a mere possibility of success on their Title VII claims.

2. **Plaintiffs' § 1983 Claims**

In Count II of the Amended Complaint, Plaintiffs also allege a deprivation of their equal protection rights under the Fourteenth Amendment in violation of 42 U.S.C. § 1983. Doc. 12, p. 11. The Sixth Circuit has recognized that:

> A plaintiff who alleges disparate treatment by a state employer is bringing essentially the same claim under Title VII as under § 1983. If there is liability under Title VII, there should be liability under § 1983. Similarly, if there was no discriminatory intent there cannot be liability under either Title VII, on a disparate treatment theory, or § 1983.

*Grano v. Dept. of Development of the City of Columbus*, 637 F.2d 1073, 1082 (6th Cir. 1980); see also *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982) ("When section 1983 is used as a parallel remedy for violation of section 703 of Title VII the elements for the two causes of action are the same."). It follows, therefore, that, if Plaintiffs have established more

---

[8] Because it is not authorized by the BFOQ, the gender restriction implemented for the Male Security position appears to be prohibited as an unlawful discriminatory practice under O.R.C. § 4112.02. However, that may not preclude Defendants from asserting it as a BFOQ defense under federal law.

than a mere possibility of success on their Title VII claims, they have also established the same probability of success on their equal protection claims under § 1983.

**B.     Irreparable Harm**

The second prong of the preliminary injunction analysis is whether Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. *Certified Restoration Dry Cleaning Network,* 511 F.3d at 550. The moving party must demonstrate that irreparable injury will occur unless a preliminary injunction is granted. *EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037 (1981). Plaintiffs have failed to meet their burden in this case.

Plaintiffs' principal argument is that irreparable injury may be presumed from the fact of the occurrence of discrimination itself. Doc. 2, pp. 8-9. This argument is without merit because Sixth Circuit case law makes clear that, under a Title VII claim, the plaintiff must show irreparable harm in order to obtain a preliminary injunction. *Anchor Hocking*, 666 F.2d 1037.[9] In *Anchor Hocking*, the Sixth Circuit addressed whether § 706(e)(2) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(2), permits the issuance of a preliminary injunction without the traditional showing of irreparable injury. The court found that the legislative history of § 706(f)(2) indicated that Congress did not "intend to abandon the time-honored requirement of showing irreparable injury." *Id.* at 1042. The court stated that the "creation of such an irrebuttable presumption [of irreparable injury] is not justified. A violation of this statute, as a matter of fact, may or may not create irreparable injury to an individual or to the EEOC." *Id.* at 1043. Thus, the court held that irreparable injury must be show before the EEOC or the aggrieved party is entitled to a preliminary injunction. *Id.* Plaintiffs are therefore required to show irreparable harm in order to obtain an preliminary injunction.

---

[9] Again, Plaintiffs inexplicably failed to cite *Anchor Hocking* in their Motion for Preliminary Injunction.

Plaintiffs argue, secondarily, that, under the new job classifications, they "may find themselves assigned to a shifts which create [sic] a hardship with respect to obligations to and responsibility for children and other family members." Doc. 2, p. 9.[10] This argument is supported by the affidavits of Plaintiffs Shawntell Kennedy and Cathy Phillips who state that they will suffer hardships in caring for their families because of being reassigned from the day to the midnight shift. Doc. 3, Exhibits 7 & 8. In addition, Plaintiffs Jacquetta Hawkins and Melissa House testified that, although they will not change shifts in 2012 under their new classifications, their days off will change and they may have difficulty in obtaining the vacation schedules they desire since they will be bidding against different groups of employees than they previously bid against and some of those employees may have more seniority. Tr. Vol. I, pp. 40-41, 60, 65-66. Neither testified that any request for vacation has been denied.

These statements fail to establish irreparable harm. The affidavits of Plaintiffs Kennedy and Phillips are insufficiently specific and do not allege that they will either be forced to make and/or will be unable to make alternate arrangements to care for their families. Irreparable harm is harm that is "actual and imminent" as opposed to "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443F.3d 540, 552 (6th Cir. 2006). Moreover, irreparable harm is harm that is not fully compensable by monetary damages." *See, e.g., Certified Restoration Dry Cleaning Network,* 511 F.3d at 550. (internal quotation omitted). The testimony of Plaintiffs Hawkins and House establishes at most an inconvenience with respect to their days off and at best a speculative loss with respect to their preferred vacation times.

In *Fuller v. Highway Truck Drivers*, 228 F. Supp. 287 (E.D. Pa. 1964), *aff'd*, 428 F.2d 503 (3d Cir. 1970), the plaintiffs complained of being subjected to less desirable work

---

[10] Defendants asserted, and Plaintiffs did not dispute, that only 16 of the 21 Plaintiffs are affected by the BFOQ. Doc. 20, p. 3.

assignments requiring them to report for work earlier in the morning. The court determined that this inconvenience did not constitute irreparable harm and had "never been regarded as the type of damage immeasurable in dollars. Courts daily award damages for pain, suffering and far more serious inconveniences." *Id.* at 290. In addition, in *Sampson v. Murray*, 415 U.S. 61, 39 L. Ed. 2d 166, 94 S. Ct. 937 (1974), a wrongful discharge case, the plaintiff alleged that her dismissal caused her to suffer a loss of income and damage to her reputation. The U.S. Supreme Court assumed the plaintiff could substantiate that harm but said, "we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction." *Id.* at 91-92. The court also observed that insufficient savings or difficulties in immediately obtaining other employment would not constitute irreparable injury. *Id.* at 92 n.68. If a discharge from employment with all of its attendant difficulties is not irreparable injury, the harm complained of in this case amounts to nothing more than inconvenience.

Finally, Plaintiffs have not argued or shown that, if a preliminary injunction is denied, the Court will not be able to award complete relief by restoring Plaintiffs to their former positions should they be successful at trial. Accordingly, for the foregoing reasons, Plaintiffs have failed to establish irreparable harm.

C.  **Harm to Others and the Public Interest**

Because Plaintiffs' case for preliminary injunctive relief fails on the issue of irreparable harm, it is unnecessary to address the final factors under the preliminary injunction standard. *City of Monroe,* 341 F.3d at 476 ("[A] district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue").

### III.  Conclusion and Recommendation

For the foregoing reasons, the Court should DENY Plaintiffs' Motion for Preliminary Injunction.

Dated: January 3, 2012

Kathleen B. Burke
United States Magistrate Judge

### **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).